# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JODI SHEARN,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| v. | : | |
| | : | **NO. 14-3706** |
| | : | |
| **WEST CHESTER UNIVERSITY, ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>ORDER</u>

   **AND NOW**, this _____ day of October, 2014, upon consideration of Defendants' Partial

Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 12) and Plaintiff's Response in

Opposition thereto (Doc. 13), **IT IS HEREBY ORDERED AND DECREED** that Defendants'

Motion is **GRANTED IN PART and DENIED IN PART** as follows: [1]

---

   [1] Defendants West Chester University and Jerome Williams brought the instant Partial Motion to
Dismiss Plaintiff's Second Amended Complaint (Doc. 12). Defendants argue that Counts II and III of
Plaintiff's Second Amended Complaint should be dismissed. For the following reasons, the Defendants'
Partial Motion is *granted in part and denied in part*.

### FACTUAL BACKGROUND

   Plaintiff Jodi Shearn, Ph.D ("Prof. Shearn") began her full-time employment as an adjunct
professor with Defendant West Chester University ("WCU") in the fall semester of 2009 teaching in the
Languages and Cultures Department ("Department"). As an adjunct professor, Prof. Shearn was a party to
the Collective Bargaining Agreement ("CBA") between the Association of Pennsylvania State College
and University Faculties ("APSCUF") and the Pennsylvania State System of Higher Education
("PSSHE"). WCU was a member of the PSSHE and thus, subject to the CBA.

   As of the fall of 2013, Prof. Shearn was a full-time temporary faculty member. At that time, the
CBA provided that full-time temporary faculty members who worked at WCU "for five (5) full,
consecutive academic years in the same department, shall be placed in tenure-track status, if
recommended by the majority of the regular department faculty in accordance with the procedure
developed by that department faculty." Pl.'s Second Am. Compl. Ex. A at ¶ 11(G). The 2013-2014
academic year constituted Prof. Shearn's fifth consecutive year as a full-time temporary faculty member
in the Department at WCU.

   Prof. Shearn states that she learned about the terms of the CBA and her eligibility for tenure-track
status through her union representative in May of 2013. She then began discussing Section 11G of the
CBA with the Department, including Defendant Jerome Williams ("Dr. Williams"), Department

1

Chairperson. Prof. Shearn alleges that Dr. Williams advised her that the Department did not follow the procedures outlined in the CBA. Following this conversation, Prof. Shearn reported the situation to her union representative, the President of APSCUF, and WCU's Dean of College of Arts and Sciences. She also discussed the CBA with other adjunct faculty in the Department.

Prof. Shearn alleges that after reporting the Department's possible violations of the CBA, Dr. Williams retaliated and began treating her differently. She asserts that Dr. Williams failed and/or refused to assign her enough classes to remain a full-time adjunct professor in the spring 2014 semester, thereby pre-empting the application of Section 11G of the CBA. Prof. Shearn also avers that Dr. Williams advised the Department's adjunct staff that all adjuncts would be terminated after the spring 2014 semester.

Prof. Shearn's Second Amended Complaint asserts the following three claims against Defendants WCU and Dr. Williams: (1) violation of Pennsylvania Whistleblower Law, 42 P.S. § 1421, et seq. (Count I); (2) violation of the First Amendment of the United States Constitution (Count II); and (3) violation of 42 U.S.C. § 1983 (Count III). Defendants seek to dismiss Counts II and III of Prof. Shearn's Second Amended Complaint. In her Response in Opposition, Prof. Shearn conceded that her § 1983 claims against WCU in Count III should be dismissed. The Court's discussion will therefore focus on Prof. Shearn's Count II claims and her Count III claims against Defendant Dr. Williams.

## STANDARD OF REVIEW

A court may dismiss a plaintiff's complaint under Rule 12(b)(6) only when it does not state a claim for relief that is "plausible on its face." Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010) (quoting Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)). All well-pleaded factual allegations contained in a plaintiff's complaint must be accepted as true and must be interpreted in the light most favorable to the plaintiff. Argueta v. U.S. Immigration & Customs Enforcement, 643 F.3d 60, 74 (3d Cir. 2011). A complaint is plausible on its face when its factual allegations allow a court to draw a reasonable inference that a defendant is liable for the harm alleged. Santiago, 629 F.3d at 128.

To determine the sufficiency of a complaint, courts of the Third Circuit are required to perform a three-step analysis. Id. at 130. First, a court must identify plaintiff's claims and determine the required elements of those claims. Id. Next, a court must identify, and strike, conclusory allegations contained in plaintiff's complaint. Id. Conclusory allegations are those that are no more than "an unadorned, the-defendant-unlawfully-harmed-me accusation, labels and conclusions, a formulaic recitation of the elements of a cause of action, or naked assertion[s]." Argueta, 643 F.3d at 72 (quoting Iqbal, 556 U.S. at 678) (internal quotation marks omitted). Finally, a court must determine if the remaining factual allegations, "plausibly give rise to an entitlement for relief." Id. at 73.

The focus of a court's inquiry to the sufficiency of a plaintiff's complaint is always plausibility of relief. Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir. 2012). Plausibility does not require a plaintiff's complaint to demonstrate entitlement to relief is likely or probable. Argueta, 643 F.3d at 72.

A plaintiff's complaint must only plead facts sufficient "to raise a reasonable expectation that discovery will reveal evidence of the necessary element." McTernan v. City of York, Pa., 564 F.3d 636, 646 (3d Cir. 2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)). "A complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." McTernan, 564 F.3d at 646 (citing Twombly, 550 U.S. at 555-56).

## DISCUSSION

## Count II - First Amendment violations

Count II of Prof. Shearn's Second Amended Complaint alleges that Defendants violated Prof. Shearn's rights under the First Amendment to the United States Constitution.

To state a First Amendment retaliation claim, a public employee must show: (1) that the activity is in fact protected and (2) the protected activity was a substantial factor in the alleged retaliatory action. Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005). The first prong of this test presents questions of law for the court while the second prong presents questions of fact for the jury. See Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004).

Two inquiries guide interpretation of the constitutional protections accorded to public employee speech:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

Garcetti v. Ceballos, 547 U.S. 410, 418 (2006) (citing Connick v. Myers, 461 U.S. 138, 147 (1983); Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568 (1968)).

"A public employee's speech involves a matter of public concern if it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" Baldassare v. State of New Jersey, 250 F.3d 188, 195 (3d Cir. 2001) (quoting Green v. Phila. Hous. Auth., 105 F.3d 882, 885-86 (3d Cir. 1997)). Courts consider the content, form, and context of the speech. Id. "The content of the speech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials.'" Id. (quoting Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993)). "Employee grievances that neither seek to communicate to the public nor advance a political or social point of view beyond the employment context will be deemed matters of private concern." Milano v. Bd. of Educ. of Franklin Twp., No. 11-6803, 2012 WL 5498012, *3 (D.N.J. Nov. 13, 2012).

Defendants argue that Prof. Shearn cannot satisfy the first prong of the First Amendment retaliation test because she did not engage in protected activity. Defendants contend that Prof. Shearn spoke as an employee upon matters only of personal interest. Defendants also assert that any complaints that Prof. Shearn made "up the chain of command" about Dr. Williams's alleged misconduct were within the scope of Prof. Shearn's official duties. Prof. Shearn counters that her activities involved matters of public concern when she spoke out about Defendants' decision to flout the CBA and petitioned via union grievance. Prof. Shearn further argues that she exercised her petition rights by filing the present lawsuit and in retaliation, Defendants refused to negotiate her union grievance. Pl.'s Second Am. Compl. ¶ 48.

Two other district courts have concluded that speech pertaining to an individual's tenure does not relate to matters of public concern. See Ballard v. Blount, 581 F. Supp. 160, 164-65 (N.D. Ga. 1983) (concluding "that absent unusual circumstances an administrative decision to grant or deny tenure to an individual is not a matter of public concern, and an individual challenging this administrative decision is without First Amendment protection."); Milano, 2012 WL at *5 (finding that plaintiff's appeal of the Board's decision to deny her tenure was not a matter of public concern).

The Court agrees with the conclusions of law in Ballard and Milano. Prof. Shearn's speech concerning Defendants' decision to disregard the CBA did not relate to matters of public concern. First, after learning about the possibility for faculty consideration of her tenure status, Prof. Shearn spoke to Dr. Williams about Section 11G of the CBA. She complained to her union representatives and others to voice concerns regarding possible Department breaches of the CBA and how she was being treated. These actions were made in Prof. Shearn's personal interest. Moreover, Prof. Shearn's challenges to Defendants' decision to disregard Section 11G of the CBA did not relate to matters of political or social import, but rather internal Department affairs. Nothing in Prof. Shearn's Second Amended Complaint demonstrates that she sought to communicate Defendants' alleged misconduct to the public or sought to advance a political or social point of view beyond the context of her employment. Accordingly, the Court concludes that Prof. Shearn's speech relating to Defendants' purported violations of the CBA did not pertain to matters of public concern and is without First Amendment protection.

However, Prof. Shearn also alleges that Defendants retaliated against her after she exercised her petition rights via the present lawsuit. See Pl.'s Second Am. Compl. ¶ 48. The Third Circuit has held that

"any lawsuit brought by an employee against a public employer qualifies as a protected 'petition' under the First Amendment so long as it is not 'sham litigation.'" Hill v. City of Scranton, 411 F.3d 118, 126 (3d Cir. 2005). Even if the petition relates to a matter of solely private concern, the public employee is protected from retaliation for that activity. See Foraker v. Chaffinch, 501 F.3d 231 (3d Cir. 2007) (citing San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994)). In their Partial Motion to Dismiss Plaintiff's Second Amended Complaint, Defendants do not argue that Prof. Shearn's suit is a sham nor do they address Prof. Shearn's allegations regarding violations of her petition rights.

The Court concludes that Prof. Shearn has pled sufficient facts to satisfy the first prong of the First Amendment retaliation test, that she engaged in protected activity when she exercised her petition rights via this lawsuit. As previously discussed, the second prong of this test involves questions of fact for the jury. Accordingly, the Court finds that Prof. Shearn's Second Amended Complaint pleads sufficient factual allegations to plausibly give rise to an entitlement for relief.

For the foregoing reasons, the Court will deny Defendants' Motion as to Count II alleging violations of Prof. Shearn's protected petition rights.

**Count III - 42 U.S.C. § 1983 violations**

Count III of Prof. Shearn's Second Amended Complaint alleges that WCU and Dr. Williams deprived Prof. Shearn of her constitutional rights in violation of 42 U.S.C. § 1983. Prof. Shearn seeks declaratory and injunctive relief under §1983. In her Response in Opposition to Defendants' Partial Motion to Dismiss, Prof. Shearn conceded that her § 1983 claim against WCU should be dismissed. However, she maintains her § 1983 claims against Dr. Williams in his individual and official capacities.

In their Partial Motion to Dismiss, Defendants argue that Pennsylvania's sovereign immunity bars Prof. Shearn's § 1983 claims against WCU. Defendants contend that sovereign immunity protects Commonwealth parties against suit unless the General Assembly "specifically waive[s] the immunity." See 1 Pa. C.S. § 2310; 42 Pa. C.S. §§ 8521-22. Although Defendants' arguments are limited to sovereign immunity protections with respect to WCU, Defendants attempt to extend this reasoning to Dr. Williams. The Court rejects Defendants' arguments, but will dismiss Count III of Prof. Shearn's Second Amended Complaint for the following reasons.

To establish a claim under Section 1983, "a plaintiff must allege and demonstrate the deprivation of a right secured by the Constitution or laws of the United States by a person acting under color of state law." Johnson v. Commonwealth of Pa. Dep't of Corrs., No. 92-5149, 1992 WL 392601, *1 (E.D. Pa. Dec. 18, 1992). In the instant matter, Prof. Shearn alleges that Dr. Williams, in his individual and official capacities, deprived her of her "constitutionally protected rights by, *inter alia*, advising that the Department did not enforce Section 11G of the CBA and terminating Ms. Shearn's employment after she asserted her rights under the CBA . . . ." Pl.'s Second Am. Compl. ¶ 53. Here, Prof. Shearn attempts to enforce her First Amendment right to free speech by way of a § 1983 action. However, Prof. Shearn's §1983 claims cannot be viable because her underlying First Amendment free speech claims have failed.

After carefully reviewing Prof. Shearn's Second Amended Complaint and Response in Opposition, the Court concludes that Prof. Shearn did not intend to assert any §1983 claims for violation of her First Amendment petition rights against Dr. Williams. In her Second Amended Complaint, Prof. Shearn alleges:

> Defendants violated Ms. Shearn's rights under the First Amendment of the United States constitution by, *inter alia,* terminating her employment after Ms. Shearn spoke up about her rights under the CBA and refusing to engage in negotiations related to Ms. Shearn's union grievance due to the filing of the present lawsuit.

Pl.'s Second Am. Compl. ¶ 48. Here, Prof. Shearn's reference to "Defendants" creates an ambiguity as to whether she is alleging that both Defendants violated her petition rights.

Count III of the Second Amended Complaint, however, clarifies this ambiguity when Prof. Shearn specifies the alleged misconduct for which each Defendant is responsible. In Count III, Prof.

1. Defendants' Motion is **DENIED** as to Count II of Plaintiff's Second Amended Complaint; and

2. Defendants' Motion is **GRANTED** as to Count III of Plaintiff's Second Amended Complaint.

> **BY THE COURT:**
>
> /s/ Petrese B. Tucker
>
> _____
>
> **Hon. Petrese B. Tucker, C.J.**

---

Shearn limits her claims against Dr. Williams to the purported free speech violations. See Second Am. Compl. ¶ 53. However, her claims against WCU include the alleged violations of her protected petition rights when she states, "Defendant WCU further violated Ms. Shearn's rights when it refused to discuss resolution of Ms. Shearn's union grievance because she had filed the present lawsuit." Id. at ¶ 58. Prof. Shearn's intent to limit her § 1983 claim to the free speech violations is further underscored in her Response in Opposition where she fails to mention any violation of her petition rights in Section II.B, which argues for preserving her § 1983 claim against Dr. Williams.

Having found no viable First Amendment violations for which Prof. Shearn can assert a § 1983 claim, the Court will dismiss Count III of Prof. Shearn's Second Amended Complaint.

### CONCLUSION

For the foregoing reasons, Defendants WCU and Jerome Williams's Partial Motion to Dismiss Plaintiff's Second Amended Complaint will be denied with respect to Count II of Plaintiff's Second Amended Complaint. The Court will also dismiss Count III of Plaintiff's Second Amended Complaint alleging 42 U.S.C. § 1983 violations.

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JODI SHEARN,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 14-3706** |
| **WEST CHESTER UNIVERSITY OF** | : | |
| **PENNSYLVANIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>ORDER</u>

**AND NOW**, this __18th__ day of April, 2017, upon consideration of Defendants'

Motion for Summary Judgment (Doc. 29), Plaintiff's Response in Opposition thereto (Doc. 33),

and Defendants' Reply to Plaintiff's Response in Opposition (Doc. 35), **IT IS HEREBY**

**ORDERED AND DECREED** that the Motion is **GRANTED**.[1]


**BY THE COURT:**

**/s/ Petrese B. Tucker**
_____
**Hon. Petrese B. Tucker, C.J.**

---

[1] This Order accompanies the Court's Memorandum Opinion dated April 18, 2017.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JODI SHEARN,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **NO. 14-3706** |
| **WEST CHESTER UNIVERSITY OF** | : | |
| **PENNSYLVANIA, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

<u>**MEMORANDUM**</u>

**Tucker, C.J.**                                                        **April 18, 2017**

Before the Court are Defendants' Motion for Summary Judgment (Doc. 29), Plaintiff's

Response in Opposition thereto (Doc. 33), and Defendants' Reply to Plaintiff's Response in

Opposition (Doc. 35).  Upon consideration of the Parties' submissions, the Motion is

GRANTED.

**I.        FACTUAL BACKGROUND**

Plaintiff, a former temporary professor at West Chester University ("WCU"), a public

state university, sued WCU and Defendant Jerome Williams, the chairman of the WCU

Department of Languages and Cultures ("Department").  Plaintiff alleges that Defendants

retaliated against her for: (1) reporting Defendants' alleged intentional violation of a provision of

a collective bargaining agreement relating to the treatment of temporary professors, and (2) filing

an employment grievance with WCU and then later filing suit against Defendants.  Defendants

filed the present Motion for Summary Judgment seeking judgment on these two counts.

1

At WCU, professors are divided into three categories: tenured, tenure-track, and temporary. Defs.' Mem. of Law in Supp. 4, ¶¶ 4–6. A professor is considered temporary if the professor is hired on a semester-to-semester basis or on a year-to-year basis. Defs.' Mem. of Law in Supp. 4, ¶ 4. Temporary professors are further divided into two categories: (1) temporary full-time professors who teach at least four courses per semester, and (2) temporary part-time professors who teach less than four courses per semester. Williams Dep. 35. Temporary professors are also known as adjunct professors. Pl.'s Mem. in Opp'n 22, ¶ 3. Temporary professors' teaching schedules are determined by the deans of the various university departments upon consideration of any scheduling recommendations made by the various department chairpersons. Vermeulen Dep. 22–23. At the time the issues in this case arose, the chair of the Department was Defendant Williams, and the Dean of the College of Arts and Sciences, of which the Department is a part, was Dean Lori Vermeulen. *Id.* at 19.

Under a collective bargaining agreement ("CBA") that governs the relationship between WCU and a union known as the Association of Pennsylvania State College and University Faculties ("APSCUF"), temporary full-time professors have certain rights. Defs.' Mem. of Law in Supp. 5, ¶ 12. In particular, Section 11(G) of the CBA, provides that:

> [A] full-time, temporary faculty member, who has worked at a University for five (5) full, consecutive academic years in the same department, shall be placed in the tenure-track status, if recommended by the majority of the regular department faculty in accordance with the procedure developed by that department faculty.

Defs.' Mem. of Law in Supp. 5, ¶ 12; Pl.'s Mem. in Opp'n 22, ¶ 12. Eligibility for a Section 11(G) conversion vote does not guarantee that the eligible temporary professor will, in fact, receive a positive vote recommending conversion to tenure-track status. Shearn Dep. 46:16–20. Department chairs are also members to the CBA and their responsibilities and duties are similarly defined under the CBA. Pl.'s Mem. in Opp'n 29, ¶ 85.

2

**A.** **In Summer 2013, Plaintiff Meets With The Union To Discuss Frustrations Regarding Her Employment And Rights Under The CBA**

In May 2013, Plaintiff, who, by that time, had been a temporary Spanish professor at WCU for several years, met with local APSCUF President Lisa Millhous to discuss, among other things, the fact that a new instructor to the Department had been selected, over Plaintiff, to teach summer courses that Plaintiff had requested to teach. Shearn Dep. 37–39. In light of her not having been selected to teach a number of summer courses, Plaintiff wished to clarify her understanding of the process by which courses are assigned to temporary professors, as well as to learn about her rights, if any, under the CBA. *Id.* Plaintiff explained that she contacted Millhous because:

> I [had] reached out to Mr. Williams and requested summer teaching assignments . . . . I was confused to learn that a new adjunct (with no prior history in our department) had been hired and that he/she was given four summer courses. Numerous incidents occurred consecutively that brought me to the union president, Lisa Milhaus. I was interested in understanding how our chair arrives at his decisions and what rights, if any, were afforded to me, a temp faculty member. She listened to my issues and told me about article 11G of the CBA and that departments were implementing this article.

Pl.'s Mem. in Opp'n Ex. M, at 3.

Plaintiff also explained that by the time of her meeting with Millhous, Defendant Williams:

> was not responding to [Plaintiff] at all. And at that point, like I knew—and it was happening to a lot of us. A lot of weird things were happening . . . changes in our schedules, and you know, not teaching classes that we had previously taught. So I basically wanted to know . . . well how was this decided how do they bring somebody out from another . . . place somebody that they don't even know and— you know, and bring them in to teach all of these open classes.

Shearn Dep. 38–39. After this meeting, Plaintiff reached out to the other temporary professors in the Department to gauge their interest in a potential informational meeting with Millhous to

discuss temporary professor rights under the CBA, including, among other things, Section 11(G). Pl.'s Mem. of Law in Opp'n 22, ¶ 19.

**B.    In Early Fall 2013, Union Representatives Meet With Adjuncts To Answer Questions About The CBA**

In September, 2013, as a result of Plaintiff's reaching out to other temporary professors, Millhous and Dr. Jen Bacon, another professor and union representative, met with a group of temporary professors.  Pl.'s Mem. in Opp'n 22, ¶ 21.  The purpose of the meeting was to answer any questions that the temporary professors might have had regarding their rights and responsibilities under the CBA.  Shearn Dep. 52 (testifying that the meeting took place for "a lot of different reasons.  There were a lot of people that were, you know, coming up on 11-G, too. So yeah . . . it was basically just to spread that knowledge.  And of course, people . . . you know, were . . . very, very surprised that—that it even existed").

After the meeting, Bacon allegedly approached Defendant Williams to discuss "the adjuncts, including WCU's Article 11(G) Policy."  Pl.'s Mem. in Opp'n 8, ¶ 39.  Meanwhile, in early Fall 2013, the Dean of the College of Arts and Sciences, Lori Vermeulen, approved a Department program aimed at hiring several new tenure-track faculty members.  Pl.'s Mem. in Opp'n 23, ¶ 27; *see also* Shearn Dep. 62:3–4.  Ultimately, a number of Spanish professors and a German tenure-track professor were hired.  Shearn Dep. 62:3–4; Williams Dep. 90:20–24.

**C.    In December 2013, Defendant Williams Announces The Hiring Of Tenure-Track Faculty And The Effect On Available Courses For Adjuncts**

On or about November 26, 2013, Defendant Williams emailed the Department's adjunct professors to schedule a meeting to discuss the impact that the hiring of these new tenure-track professors would have on the Department.  Pl.'s Mem. in Opp'n 24, ¶ 28.  The meeting ultimately took place in early December ("December Adjuncts Meeting").  Pl.'s Mem. in Opp'n

4

9, ¶ 43.  At the meeting, Defendant Williams announced that the Department would be hiring new tenure-track faculty members and that the hiring would result in a reduction in the number of courses available for adjunct professors to teach.  *See* Pl.'s Mem. in Opp'n Ex. M, at 3 (providing that it was Plaintiff's recollection that Defendant Williams explained that the "55 courses normally available to Spanish adjuncts would be reduced to 15"); Williams Dep. 118:18 (testifying that "many of the adjuncts would be reduced").

At this December Adjuncts Meeting, and for the first time, Professor Theresa Mehringer—another professor in the Department—asked Defendant Williams directly about the Department's position regarding Section 11(G).  *See* Shearn Dep. 54 (providing that Plaintiff did not directly discuss Section 11(G) with Defendant Williams until the December Adjuncts Meeting); Pl.'s Mem. in Opp'n 11, ¶ 52; Shearn Dep. 63 (recalling that Mehringer, and not Plaintiff, stated "'What about article 11G?  We have people who qualify for conversion'").  In response to Mehringer's inquiry, Defendant Williams explained that the Department "did not honor article 11G, that new people with skills that we don't currently employ is what the department wants."  Pl.'s Mem. in Opp'n, Ex. M, at 3.  The temporary professors "couldn't believe it."  Shearn Dep. 59:3–13.  They were shocked to learn that the Department would not implement Section 11(G).  *Id.*  At that time, there was no further "follow-up by either Mehringer or by [Plaintiff] in response to Defendant Williams' remarks on Section 11(G).  *Id.* at 59:12.

### D.    Adjunct Professors' Teaching Schedules Released; Plaintiff Receives One Fewer Class Than Prior Semester

After this meeting, on December 23, 2013, teaching schedules for the Spring semester were released and showed that two people, Theresa Mehringer and Plaintiff, had a reduced schedule relative to the prior semester.  Vermeulen Dep. 82; Shearn Dep. 123.  As a result of the reduction of Plaintiff's schedule from a full to a partial load, Plaintiff no longer qualified for

5

certain benefits. Pl.'s Mem. in Opp'n 12, ¶ 61. Though she was unaware that she would have qualified for a Section 11(G) conversion vote at that time, her reduced schedule also resulted in her loss of eligibility for a Section 11(G) conversion vote. *Id.*

### E. Plaintiff Viewed The Reduction In Her Course Load As Retaliation Prompting Plaintiff To Seek Assistance From The Dean

After seeking help within the Department to increase her teaching load from partial to full, without success, Plaintiff contacted Dean Vermeulen. Shearn Dep. 144–45. The two met and Plaintiff expressed her frustration with her reduced course load and also reported what had transpired during the December Adjuncts Meeting between Defendant Williams and the adjuncts. *Id.* Following this meeting, Dean Vermeulen, however, chose not to increase Plaintiff's schedule because Dean Vermeulen had reviewed the Department schedule for all adjuncts and it appeared that the classes were generally evenly distributed. Pl.'s Mem. in Opp'n 26, ¶ 40. Further, Dean Vermeulen reasoned that increasing Plaintiff's course load would reduce course loads for other temporary professors. *See id.* (admitting that "Dean Vermeulen did not change [P]laintiff's schedule to add another class because she saw that more than one person had less than a full-time schedule, that the classes for temporary faculty seemed evenly distributed and if she changed [P]laintiff's schedule then someone else would have less than a full-time schedule.").

Though on a partial schedule, Plaintiff remained employed by WCU through Fall 2014 semester as she taught a course in WCU's Women's Studies Department. Shearn Dep. 191–92.

### F. Plaintiff Files An Employee Grievance; Plaintiff Files A Lawsuit

In 2014, Plaintiff filed an employee grievance against WCU. Pl.'s Mem. in Opp'n 26, ¶ 41; *id.* at 14, ¶ 74; *id.* at Ex. M. Among other things, Plaintiff focused her grievance on the adverse changes to her employment status and her frustration with the Department's apparent

6

disregard for her efforts to improve WCU.  *See generally* Pl.'s Mem. in Opp'n, Ex. M.  In her

grievance, Plaintiff asserted:

> I have learned through the years that I am expected to take what I am given and be thankful that I have four classes and can afford to receive medical benefits for my family
>
> . . . .
>
> I have been declined support from my chair to advance professionally and serve my department . . . . Refusal to support [my] efforts, or any effort to advance myself for that matter, became clear during the summer, 2013
>
> . . . .
>
> [Defendant Williams] did not thank us for our years of service while he was telling us that new faculty members would be replacing us
>
> . . . .
>
> A few days later we received a memo from Jerry that said he was reducing some of our teaching loads due to low enrollment.  I was the only one who received a reduced load
>
> . . . .
>
> I am a senior adjunct who depends on health benefits for my family, yet he gave courses to instructors that teach only one course and have full-time jobs
>
> . . . .
>
> During the winter break I lost health benefits
>
> . . . .
>
> I realized that my load was cut back intentionally.  It was my 10th semester full-time, and I would be eligible for article 11G . . . . I was punished because of my involvement with the union and my knowledge of article 11G.

*Id.* at 2–4.  Four actions were requested to resolve Plaintiff's employment grievance:

1. Management will cease and desist denying conversion vote opportunities by reducing faculty teaching loads.
2. Management will restore Prof. Shearn's full-time status for Spring 2014 semester, including restoration of benefits appropriate to her workload.
3. Management will instruct the Department of Languages and Cultures to conduct a conversion vote for Professor Shearn in compliance with Article 11G of the CBA.
4. Management will make Professor Shearn whole for all losses, financial and otherwise, with interest.

*Id.* at 7.  Later, WCU offered to settle Plaintiff's employment grievance.  Pl.'s Mem. in Opp'n

27, ¶ 52.  A union representative, who was not authorized to accept WCU's settlement offer

because of the level at which Plaintiff's grievance was filed, mistakenly accepted the settlement

on Plaintiff's behalf.  *Id.* at 27, ¶ 55–56; *id.* at 27, ¶ 60.  In the time between Plaintiff's first

submission of her grievance, and the unauthorized settlement, Plaintiff filed the present lawsuit.

*Id.* at 26, ¶ 43.  After the filing of her lawsuit, Plaintiff continued through the employee

grievance process, but was unable to reach a resolution.  *Id.* at 28, ¶ 67.

## II.    PROCEDURAL HISTORY

On March 20, 2014, Plaintiff filed a Complaint alleging state law causes of action against

Defendants in the Court of Common Pleas of Philadelphia County.  In response to the

Complaint, Defendants filed Preliminary Objections, the state equivalent to a federal motion to

dismiss.  In response to the Preliminary Objections, Plaintiff filed an Amended Complaint

asserting new federal law claims including a claim against Defendants for a violation of the First

Amendment and a claim under 42 U.S.C. § 1983.  As the Amended Complaint alleged claims

arising from federal law, Defendants removed the case to this Court.

After removal to this Court, Plaintiff filed a Second Amended Complaint and Defendants

filed a Motion to Dismiss.  On October 24, 2014, the Court issued an Order granting the Motion

to Dismiss in part and denying it in part.  The Court granted the Motion to Dismiss as to Count

III (Violation of Plaintiff's Rights Under 42 U.S.C. § 1983) because Plaintiff's "speech relating

to Defendants' purported violations of the CBA did not pertain to matters of public concern and

is without First Amendment protection."  The Court denied the Motion to Dismiss as to Count II

(Violation of Plaintiff's First Amendment Rights).  In view of the Court's October 24, 2014

Order, therefore, the only remaining counts in this matter are Count I (Violation of Pennsylvania

Whistleblower Act) and Count II (Violation of Plaintiff's First Amendment Rights).

After extensive discovery, Defendants filed the present Motion for Summary Judgment.

Defendants seek summary judgment on the two remaining counts of Plaintiff's Second Amended

Complaint.

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, courts shall grant summary judgment in favor

of the moving party "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  A fact is

"material" if it is "one that might 'affect the outcome of the suit under governing law.'" *Smith v.*

*Johnson & Johnson*, 593 F.3d 280, 284 (3d Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)).   A dispute as to a material fact is "genuine" if it "is one that 'may

reasonably be resolved in favor of either party.'"  *Lomando v. United States*, 667 F.3d 363, 371

(3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 250).

The movant has the initial "burden of identifying specific portions of the record that

establish the absence of a genuine issue of material fact."  *Santini v. Fuentes*, 795 F.3d 410, 416

(3d Cir. 2015).  If the movant can sustain its initial burden, "the burden shifts to the nonmoving

party to go beyond the pleadings and 'come forward with specific facts showing that there is

a genuine issue for trial.'"  *Id.*  (internal quotation marks omitted) (quoting *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  When assessing a motion for

summary judgment, the court "must construe all evidence in the light most favorable to the

nonmoving party."  *Id.*  Still, the court must be mindful that, "[t]he mere existence of a scintilla

of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## IV. DISCUSSION

### A. Plaintiff's Claim Under The Pennsylvania Whistleblower Act

Plaintiff has failed to establish the prima facie case for a claim under the Pennsylvania Whistleblower Act ("Whistleblower Act") because Plaintiff cannot demonstrate "by concrete facts or surrounding circumstances that the report of wrongdoing or waste led to the plaintiff's dismissal." *Evans v. Thomas Jefferson Univ.*, 81 A.3d 1062, 1070 (Pa. Commw. Ct. 2013) (citing *Golaschevsky v. Dep't of Envtl. Res.*, 683 A.2d 1299, 1304 (Pa. Commw. Ct. 1996)).

The Whistleblower Act provides, in pertinent part:

> **(a)      Persons not to be discharged.—**No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

> **(b)      Discrimination prohibited.—**No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee is requested by an appropriate authority to participate in an investigation, hearing or inquiry held by an appropriate authority or in a court action.

43 Pa. Stat. and Cons. Stat. Ann. § 1423 (West 2016).

To establish the prima facie case of retaliation under these provisions of the Whistleblower Act, a plaintiff must prove "by a preponderance of the evidence, that, prior to the alleged acts of retaliation, [s]he had made a good faith report of wrongdoing to appropriate authorities . . . [and] [t]he plaintiff must come forward with some evidence of a connection between the report of wrongdoing and the alleged retaliatory acts." *Kimes v. Univ. of Scranton*,

126 F. Supp. 3d 477, 504 (M.D. Pa. 2015) (citing *O'Rourke v. Commonwealth*, 778 A.2d 1194 (Pa. 2001)) (emphasis added). The connection between the report of wrongdoing and the alleged retaliatory acts must be "demonstrated by concrete facts or surrounding circumstances." *Evans*, 81 A.3d at 1070 (internal quotation omitted).

The type of concrete facts that can establish a causal connection includes evidence that the reporting employee received "specific direction or information . . . not to file the report or that there would be adverse consequences because the report was filed." *Evans*, 81 A.3d at 1070 (citing *Golaschevsky*, 683 A.2d at 1304). "'[V]ague and inconclusive circumstantial evidence' is insufficient to satisfy that threshold burden to show a causal connection." *Id.* Among other forms of circumstantial evidence that Pennsylvania courts have found insufficient to establish a causal connection is the fact that a plaintiff may have suffered harm by the employer after the alleged reporting of the employer's wrongdoing. Thus, "the mere fact that [a plaintiff's] discharge occurred a few months after [plaintiff's] report of wrongdoing . . . by the employer . . . are not enough to show a causal connection." *Id.* *Evans* illustrates some of the facts that courts have found insufficient to show the requisite causal connection under the Whistleblower Act. *Id.*

In *Evans*, the plaintiff, a nurse, sued her employer and the director of the drug treatment center where she worked for allegedly retaliating against the plaintiff after she reported the director for violating a work policy prohibiting the distribution of methadone to patients that might be intoxicated. 81 A.3d at 1064. After the plaintiff's report of the director's wrongdoing, the plaintiff suffered a number of allegedly retaliatory employment actions. *Id.* at 1066. These retaliatory actions included, among other things: the director acting rude or hostile toward the plaintiff, the plaintiff's annual performance rating dropping from "outstanding" before her report of wrongdoing to only "effective" after the report, the plaintiff receiving formal disciplinary

warnings regarding her interactions with patients, the plaintiff's suspension for three days without pay, and the plaintiff's indefinite suspension without pay for an interaction she had with a new employee. *Id.* at 1066–68. Ultimately, the plaintiff was terminated. *Id.*

The trial court dismissed plaintiff's case. *Evans*, 81 A.3d at 1068. The appellate court later affirmed the trial court's ruling and agreed that the plaintiff had failed to establish "by concrete facts or surrounding circumstances that the report of wrongdoing or waste led to the plaintiff's dismissal." *Id.* The plaintiff argued that despite the lack of direct evidence linking the adverse employment actions to her report, there was more than ample indirect evidence to allow her claim to survive a motion for summary judgment. *Id.* In particular, the plaintiff argued that three facts established the causal connection between her report of wrongdoing and her employer's allegedly retaliatory actions. These three facts were that:

1. the [plaintiff's] discharge and most or all of the warnings and disciplinary actions for conduct toward patients and coworkers occurred after the report;
2. she received a rating of "Outstanding" in her annual review nine months before the report and a lower, but satisfactory, rating of "Effective" in her annual review a few months after the report; and
3. she felt that [her supervisor] treated her differently and in a hostile manner after the report.

*Id.* at 1070.

The appellate court, however, disagreed with the plaintiff and held that the facts presented by the plaintiff were insufficient to establish a causal connection. *Evans*, 81 A.3d at 1071. The appellate court reasoned that the facts before it were similar to the facts that the Pennsylvania Supreme Court in *Golaschevsky* found insufficient under the Whistleblower Act to establish a prima facie case of retaliation. *Id.*

12

As the appellate court in *Evans* noted, the Pennsylvania Supreme Court in *Golaschevsky* held that a plaintiff failed to show the requisite causal connection between his report of alleged wrongdoing and his adverse employment action despite the plaintiff's showing:

1.  that he received a negative performance evaluation three weeks after his report of wrongdoing and another negative evaluation four months after his report;
2.  that he had not been told of any problems with his work before his report of wrongdoing;
3.  that his supervisor got angry with him when he made the report; and
4.  that he subjectively felt that supervisors and co-workers treated him differently and stopped co-operating with him after the report.

*Evans*, 81 A.3d at 1071 (citing *Golaschevsky*, 720 A.2d at 759–60). In view of the Pennsylvania Supreme Court's holding in *Golaschevsky*, the appellate court in *Evans* affirmed the trial court's decision to grant judgment against the plaintiff because she had not adduced sufficient evidence to establish a causal connection. *Evans*, 81 A.3d at 1071.

In the present case, Plaintiff has not—just as the plaintiffs in *Evans* and *Golaschevsky* had not—shown by concrete facts or by surrounding circumstances that the adverse employment actions taken against her are causally connected to her report of Defendants' alleged wrongdoing, namely, her report that Defendants would not implement Section 11(G) of the CBA. Plaintiff's facts in support of finding causation are analogous to those facts that were expressly held insufficient by the Pennsylvania Supreme Court in *Golaschevsky* and the appellate court in *Evans*.

Here, the Court focuses on three factors, among others, that bar a finding that Plaintiff has shown a causal connection by concrete facts or by surrounding circumstances in this case. First, even before Plaintiff knew of the existence of Section 11(G) and before Plaintiff reported any wrongdoing at all, Plaintiff had already experienced what she perceived to be adverse changes to her employment, some of which Plaintiff points to as evidence of retaliation. Second,

13

Plaintiff was notified that all temporary professors would be adversely affected by tenure-track faculty program before Plaintiff was aware that the Department and Defendant Williams would not implement Section 11(G).  Third, while Plaintiff may have experienced additional adverse changes to her employment after her purported report of wrongdoing, these adverse changes, without more, cannot establish a causal connection under the Whistleblower Act as a matter of law.

First, by the time of her alleged report, Plaintiff had already complained of a number of adverse changes to her employment.  Therefore, all of the alleged retaliatory actions that Plaintiff claims were the result of her report cannot all be attributed to the fact that she made an alleged report.   In fact, approximately three months before Plaintiff made her alleged report, Plaintiff complained that Defendant Williams:

> was not responding to [Plaintiff] at all.  And at that point, like I knew—and it was happening to a lot of us.  A lot of weird things were happening . . . changes in our schedules, and you know, not teaching classes that we had previously taught.  So I basically wanted to know . . . well how was this decided how do they bring somebody out from another . . . place somebody that they don't even know and—you know, and bring them in to teach all of these open classes.

Shearn Dep. 38–39.  This portion of Plaintiffs own testimony shows that as early as Summer 2013 Plaintiff was experiencing negative changes to her employment at WCU.  Among other things, she had requested to teach additional courses, but was not chosen to teach those courses. *Id.* at 38.  Instead, those courses were assigned to a new professor who had never taught in the Department. *Id.*  By this time, Plaintiff also noted a shift in her relationship with Defendant Williams as Williams was "not responding to [her] at all." *Id.*

By the beginning of Fall 2013, but again, before Plaintiff's purported report, Plaintiff, and others in the Department, perceived that the Department had transformed into a "hostile work environment." *Id.* at 53.  It is undisputed that these alleged adverse changes to Plaintiff's

14

employment and the transformation of the Department into a "hostile work environment"
occurred before Plaintiff's purported report that the Department would not implement Section
11(G) of the CBA.

Second, Plaintiff only became aware that the Department would not implement Section
11(G) after Defendant Williams had announced that the tenure-track faculty hiring program
would reduce the number of available courses for temporary professors to teach in the ensuing
semesters.  It was only after Defendant Williams had notified the temporary professors of the
forthcoming course reduction that Theresa Mehringer, not Plaintiff, asked Defendant Williams
"what about [Section] 11-G?"  Shearn Dep. 58.  Defendant William's announcement regarding
the course reductions is what Plaintiff contends "constructively terminated" her employment.
See Pl.'s Mem. in Opp'n 9–10 (asserting that "Williams Retaliates by Constructively
Discharging the Adjuncts.").  Accordingly, the "constructive discharge" to which Plaintiff points
as evidence of retaliation occurred before Plaintiff made her report and cannot logically be
evidence of retaliation.

Third, although additional adverse changes to Plaintiff's employment occurred after her
alleged report of wrongdoing, the Court is constrained by the law and may not infer that these
adverse changes were precipitated by her report simply by virtue of their temporal proximity to
the report.  This outcome is consistent with the outcomes in *Evans* and *Golaschevsky* where even
when the employers' behavior toward the reporting employees changed dramatically after the
report, such behavior was insufficient to establish a causal connection.  In *Evans*, for example,
the appellate court was unpersuaded that the plaintiff had shown a causal connection between her
report and her employer's alleged retaliatory conduct even in the face of facts that showed that
after her report, the plaintiff's performance evaluation dropped from "outstanding" to merely

"effective." *Evans*, 81 A.3d at 1071.  Likewise, in *Golaschevsky*, the Pennsylvania Supreme Court was unpersuaded that the plaintiff had shown a causal connection even in the face of facts that showed that after his report of wrongdoing, he received poor evaluations of his work despite previously never having received a complaint.  720 A.2d at 759–60.

Like the facts in *Evans* and *Golaschevsky*, the facts presently before the Court do not support a finding of causal connection.  This is especially true because unlike in *Evans* and *Golaschevsky*, in this case, there was no drastic change in Plaintiff's station or reputation in the Department after her report.  Indeed, her experience in the Department after her report was, if anything, consistent with her experience before her report.  For example, after her report, Plaintiff received one fewer course to teach than she normally received, which was consistent with her earlier experience in the Summer 2013 when she did not receive any summer courses to teach despite multiple requests for the courses.  Shearn Dep. 38.

In view of the adverse changes to Plaintiff's employment that predated her report, and in view of the fact that Defendant Williams had already announced other adverse changes to Plaintiff's and other temporary professors' employment before Plaintiff made her report of wrongdoing, the Court finds that Plaintiff cannot meet the causal connection element of the prima facie case under the Whistleblower Act.  That Plaintiff's conditions of employment may have changed for the worse after her purported report of wrongdoing does not suffice, without more, to establish a causal connection.  Having failed to establish such causal connection, Defendants motion for summary judgment on Plaintiff's claim under the Whistleblower Act must be granted, and the claim dismissed.

16

## B.    Plaintiff's First Amendment Claim

Having granted Defendants' Motion for Summary Judgment on Plaintiff's claim under the Whistleblower Act, Plaintiff's sole remaining cause of action, as set forth in Count II of the Second Amended Complaint, is her claim under the Petition Clause of the First Amendment.  In connection with Count II, Plaintiff asserts that Defendants retaliated against her for exercising her First Amendment petition rights when she filed her employee grievance and when she filed the present lawsuit.  Consistent with the Court's dismissal of Count III of Plaintiff's Second Amended Complaint, the Court must also dismiss Count II because Plaintiff's petition activity does not involve matters of public concern, but rather matters of private concern, namely, her personal conditions of employment and tenure.

It is well-established that "[t]o state a First Amendment retaliation claim, a public employee plaintiff must allege that his activity is protected by the First Amendment, and that the protected activity was a substantial factor in the alleged retaliatory action." *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006)).  Typically, First Amendment retaliation claims arise from either the Amendment's Speech Clause or Petition Clause.  In either case, the United States Supreme Court has held that the framework for evaluating whether the alleged activity by a plaintiff is protected is the same for the purposes of a retaliation claim.  *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 408 (2011) (holding that the "framework used to govern Speech Clause claims" will also apply to claims arising out of the Petition Clause).  Activity is protected under the Petition Clause, when (1) the petition was made by the plaintiff acting as a citizen, (2) the petition involved a matter of public concern, and (3) the government employer did not have adequate justification for treating the employee differently from any other member of the general public as a result of the petition.

17

*Gorum*, 561 F.3d at 185 (citing *Hill*, 455 F.3d at 241). It is the second factor of this three-factor framework that is critical in this case.

The United States Supreme Court has held that speech, or other activity, implicates a matter of public concern when "it can be 'fairly considered as relating to any matter of political, social or other concern to the community' . . . or when 'it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 467 (3d Cir. 2015) (citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). The question of whether "an employee's speech [or activity] addresses a matter of public concern must be determined by the content, form, and context of a given statement [or activity], as revealed by the whole record." *Id.* at 467–68. As a general rule, courts have held that activity that relates "solely to mundane employment grievances does not implicate a matter of public concern." *Id.* at 467 (emphasis added) (citing *Sanguigni v. Pittsburgh Bd. of Pub. Educ.*, 968 F.2d 393, 399 (3d Cir.1992)). That the content, form, and context of a purportedly protected activity must inform a court's decision in this inquiry was made clear in the Third Circuit case *Miller v. Clinton Cty.*, 544 F.3d 542 (3d Cir. 2008).

In *Miller*, the Third Circuit reversed a trial court decision that Miller, a county probation officer, had established the prima facie case for retaliation under the First Amendment. 544 F.3d at 545. The Third Circuit held that even though Miller's speech touched upon some matters of public concern, Miller's claim should have been dismissed because her alleged speech was unprotected as it, at its core, was an employee grievance and, therefore, a matter of personal concern.

Employed as a county probation officer, Miller observed one of her supervisors openly express disdain for their probationers. *Id.* at 546. Among other things, Miller's supervisor

referred to the probationers as "scum," stated that "they did not deserve the money that the Probation Office spent on them," and appeared to have a direct philosophical conflict with Miller and with the mission of the probation office. *Id.* Miller further noted that as a result of her conflict with her supervisor, her supervisor actively intimidated Miller and subjected Miller to hostility "numerous times throughout [Miller's] employment," which engendered "stressful conditions" in the probation office. *Id.*

Deeply troubled by her supervisor's thoughts and actions and the conditions of her employment, Miller sent a letter to the President Judge of the county's trial court expressing her concerns about the probation office, criticizing her supervisors, and reporting that the office was being managed ineffectively. *Miller*, 544 F.3d at 550. Upon receiving the letter, the President Judge fired Miller. *Id.* at 546. Shortly after her termination, Miller filed suit for, among other things, retaliation under the First Amendment. *Id.* Following the denial of the defendants' Motion to Dismiss, the defendants appealed. *Id.*

On appeal, the Third Circuit held that Miller failed to establish the prima facie case for retaliation because her letter was a private employee grievance, despite the fact that it spoke on matters of public concern and, therefore, was not protected under the First Amendment. *Id.* at 551. In reaching this conclusion, the Third Circuit acknowledged that while Miller's letter "undoubtedly refer[ed] to matters of public concern," the Third Circuit could "not 'cherry pick' something that may impact the public while ignoring the manner and context in which [the letter] was made or that public concern expressed." *Id.* at 550.

Proceeding with a holistic view of the letter and the facts before it, the Third Circuit found that the portions of the letter that touched upon matters of public concern were merely "collateral to the thrust of her complaint." *Id.* at 551. The thrust of Miller's complaint, by

contrast, consisted of her grievances relating to the "stressful conditions" of her workplace, including her suffering intimidation and hostility from her supervisor. *Id.* In short, the "personal context in which Miller's letter arose, in addition to the tangential connection between the issues of public concern and the overall thrust of the letter so minimizes any public concern in the subject of her expression as to tip the First Amendment balance in favor of her employer." *Id.*

In the present case, the Court concludes that in view of the context, form, and content of Plaintiff's purportedly protected activity, Plaintiff's activity was, in fact, unprotected because the activity did not involve a matter of public concern. For this reason, Defendants' Motion for Summary Judgment must be granted and Plaintiff's claim of retaliation, as set forth in Count II of the Second Amended Complaint, is dismissed.[1] The Court reaches this conclusion despite the fact that Plaintiff's petition may have touched upon matters of public concern. Such a result is consistent with the logic and holding articulated by the Third Circuit in *Miller*.

As the Third Circuit in *Miller* made clear, when determining whether allegedly protected activity involves matters of public concern, courts must consider the context from which the activity arose including the "thrust" of the activity. *Miller*, 544 F.3d at 551. Here, the context elucidates the personal nature of Plaintiff's activity. All of Plaintiff's activities, including her employee grievance and subsequent law suit, stemmed from her initial frustration regarding her treatment by Defendant Williams in and around Summer 2013.

Plaintiff's initial reason for meeting with the union in May 2013 demonstrates the personal nature of her concern. By Plaintiff's own account she sought out the assistance of the union because:

---

[1] Plaintiff's claim is dismissed despite the Court's earlier statement in its Order dated October 24, 2014 that Plaintiff met the first prong of prima facie case for retaliation under the First Amendment. Accordingly, to the extent that the October 24, 2014 Order is inconsistent with this Memorandum on Count II, this Memorandum controls.

> [Plaintiff] reached out to Mr. Williams and requested summer teaching assignments . . . . I was confused to learn that a new adjunct (with no prior history in our department) had been hired and that he/she was given four summer courses. Numerous incidents occurred consecutively that brought me to the union president, Lisa Milhaus. I was interested in understanding how our chair arrives at his decisions and what rights, if any, were afforded to me, a temp faculty member. She listened to my issues and told me about article 11G of the CBA and that departments were implementing this article.

Pl.'s Mem. in Opp'n Ex. M, at 2. In this time period, Plaintiff also explained that Defendant Williams:

> was not responding to [Plaintiff] at all. And at that point, like I knew—and it was happening to a lot of us. A lot of weird things were happening . . . changes in our schedules, and you know, not teaching classes that we had previously taught. So I basically wanted to know . . . well how was this decided how do they bring somebody out from another . . . place somebody that they don't even know and— you know, and bring them in to teach all of these open classes.

Shearn Dep. 38–39. While Plaintiff makes some reference to "us" and "we," the main thrust of her concern was the conditions of her own employment. That Plaintiff's employment conditions mirrored those of other temporary professors in this time period reinforced Plaintiff's feelings of frustration with her "hostile work environment." Thus, Plaintiff's own explanations of her intent in this early time period show that the primary reason for her subsequent actions was personal and related to the conditions of her employment.

Nevertheless, under these circumstances, it is understandable that Plaintiff sought out the assistance of the union. The Department had apparently passed over Plaintiff for a new professor with no experience in the Department and Defendant Williams had become less responsive to her communications and requests for professional advancement. Though understandable, these concerns and slights against Plaintiff remained personal. As Plaintiff's testimony shows, it was these personal concerns and slights that drove her desire to seek out the help of the union and ultimately drove her to file an employment grievance and this lawsuit. In short, the context out

of which Plaintiff's purportedly protected activity arose shows that Plaintiff's activity involved her personal employment concerns—such as the adverse changes to her relationship with Defendant Williams, and her losing professional opportunities within the Department—not public concerns.

The form of Plaintiff's activity, an employee grievance followed by this lawsuit, similarly demonstrates its personal nature.  By this lawsuit, Plaintiff, in essence, brought her employee grievance to the court system.  While the court system, indeed, represents a public forum, the mere transfer of an employee grievance—a matter of personal concern—to a court does not transform the grievance into a public concern.  *See, e.g.*, *Munroe*, 805 F.3d at 467 (holding that employee grievances are matters of private concern).  Plaintiff's formal and informal grievances and her employers' actions in response to those grievances cannot sustain her claim of retaliation because these employment grievances are personal.

Careful review of Plaintiff's employee grievance further reveals the personal thrust of her activity.  In her grievance, Plaintiff focuses her attention on those matters that affected her personal advancement and well-being in the Department while only briefly brushing upon those matters that could possibly be of public concern.  For example, Plaintiff stated in her employee grievance that:

> I have learned through the years that I am expected to take what I am given and be thankful for that I have four classes . . . . I have been declined support . . . . Refusal to support [my] efforts, or any effort to advance myself . . . became clear . . . . I was the only one who received a reduced load."

Pl.'s Mem. in Opp'n  Ex. M, at 2–4 .  This excerpt shows that her focus remained on her own treatment in the Department.  Even those portions of Plaintiff's grievance that arguably touched upon matters of public concern, such as her statement that she "was punished because of my

involvement with the union," are, at their core, further statements of personal frustration relating to Plaintiff's ongoing negative experience.

Beyond the form of Plaintiff's petition activity, the content of Plaintiff's petition and purportedly protected activity further demonstrates the private nature of the concern. As this Court previously held in its October 24, 2014 Order, consistent with the holdings in *Milano v. Bd. of Educ. of Franklin Twp.*[2] and *Ballard v. Blount*,[3] the alleged violation of the CBA, namely the Department's failure to implement Section 11(G), were not themselves a public concern because these matters pertained to Plaintiff's potential tenure status. In the absence of unusual circumstances, however, decisions relating to tenure are not matters of public concern. *See Milano*, 2012 WL at *5 (holding that a plaintiff's appeal of her employers decision not to grant her tenure was not a matter of public concern for purposes of First Amendment retaliation claim); *Ballard*, 581 F. Supp. at 164–65 (holding the same). The violations of the CBA, therefore, do not sufficiently involve a matter of public concern for the purposes of Plaintiff's First Amendment retaliation claim.

In sum, the context, form, and content of Plaintiff's purported protected activity spoke to matters of private concern and not matters of public concern. To the extent that parts of Plaintiff's petition activity touched upon matters of public concern, such parts were merely collateral to the thrust of her activity, which was personal. Accordingly, Plaintiff has failed to meet the second requisite factor to state a claim for retaliation under the Petition Clause of the First Amendment. Defendants' Motion for Summary Judgment on this claim is granted and the claim dismissed.

---

[2] No. 11-6803, 2012 WL 5498012 (D.N.J. Nov. 13, 2012).
[3] 581 F. Supp. 160 (N.D. Ga. 1983).

## V.    CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment is

GRANTED.  An appropriate order follows.